UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
JOSEPH ARENA, on behalf of himself
and all others similarly situated,

                              Plaintiffs,

            -against-                                    **MEMORANDUM & ORDER**
                                                          **12 CV 1078 (DRH)(WDW)**
PLANDOME TAXI INC. and
ROBERT MARMO, an individual,

                              Defendants.
-----------------------------------------------------------X
**APPEARANCES:**

**Leeds Brown Law, P.C.**
Attorneys for Plaintiffs
1 Old Country Road, Suite 347
Carle Place, New York 11514
By: David H. Rosenberg, Esq.
    Bryan Arbeit, Esq.
    Jeffery K. Brown, Esq.

**The Law Offices of David S. Feather**
Attorneys for Defendants
666 Old Country Road, Suite 605
Garden City, New York 11530
By: David S. Feather, Esq.

**HURLEY, Senior District Judge:**

        Plaintiff, Joseph Arena ("Arena"), brought this action on behalf of himself and those

similarly situated (collectively, "Plaintiffs"), claiming violations of the Fair Labor Standards Act

("FLSA"), New York State Labor Law ("Labor Law"), and New York Code of Rules and

Regulations ("NYCRR"), and for wrongful conversion of his funds.[1]  Plaintiffs allege that

defendants Plandome Taxi Inc. ("Plandome") and Robert Marmo ("Marmo") (collectively,

---

[1] Subsequent to Arena's commencement of this action, he, Ruben Fraiberg, Thomas Tucci, Martin Cocks and Adam Chorzepa filed "Consent[s] to Join Collective Action to Recover Unpaid Wages."  *See* Docket Numbers 17, 19, 26, 33, 34.

"Defendants"), failed to pay them the applicable minimum wage, overtime, and spread of hours pay required by law.  In addition, Plaintiffs claim that Defendants wrongfully withheld and converted their funds by deducting monies from their wages.  Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56.  For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## *BACKGROUND*

The material facts, drawn from the Complaint, the papers submitted with respect to the instant motion, and the parties' Local Civil Rule 56.1 Statements, are undisputed unless otherwise noted.

Plandome is a corporation organized under the laws of the State of New York with a principal place of business in Nassau County, New York.  Marmo states that he is the sole shareholder of Plandome.  (Affidavit of Robert Marmo, sworn to on August 29, 2012 ("Marmo Aff.") at 1.)  Plandome provides transportation within the Town of North Hempstead and its surrounding communities, including transportation to airports.  While Defendants argue that Plandome advertises itself as a taxi company, Plaintiffs argue that Plandome advertises itself as a transportation and airport service.  Plandome provides transportation services to individuals who call its dispatcher located at its base station.  Plaintiffs assert that the passengers are required to arrange their routes in advance, and the drivers may not deviate without authorization from the pre-arranged routes.  Defendants asserts that Plandome does not have contracts for recurrent transportation, and the fares it charges customers are based upon geographical zones.

Taxis are forbidden by law to cruise the streets of the Town of North Hempstead for fares. Instead, the taxis must be dispatched from base stations or operate from taxi stands.  Plandome

claims that it maintains taxi stands at the Manhasset train station and on Plandome Road in Manhasset. Plaintiffs, on the other hand, dispute Plandome's characterization of its stands as taxi stands; instead, they assert that passengers arrange for for-hire services at those locations. Similarly, Plaintiffs dispute Defendants' characterization of Defendants' vehicles as taxicabs, asserting instead that Defendants' vehicles were for-hire vehicles. Defendants state that Plandome's vehicles were licensed as taxicabs by the Town of North Hempstead, the company was registered by Nassau County Taxi and Limousine Commission ("NCTLC") as a taxi company, and Plandome's vehicles had special license plates issued by the New York State Department of Motor Vehicles ("DMV") only to taxicabs. (Marmo Aff. at 2.) However, Plaintiffs state that "Defendants selectively identify one car . . . to support the fact that all of their cars [we]re licensed as taxicabs," and the license plate on the vehicle provided by Defendants as evidence was not issued through the DMV, but, rather, was issued through the NCTLC as a plate for for-hire vehicles. (Pls.' R. 56.1 Counterstmt. ¶¶ 4, 5.) Additionally, Plaintiffs assert that the evidence indicates that not all of Plandome's vehicles were properly registered with the NCTLC. (*Id.* ¶ 4.)

Arena drove five-passenger vehicles for Plandome, and had a New York State Class E driver's license, which Defendants argue he was required to have in order to drive a taxicab. Arena worked for Plandome from August 9, 2011 to November 10, 2011. During that time period, however, he drove a taxi for Plandome on only fifty-five (55) days. There were no ramifications if Arena chose not to work on a particular day. Arena maintained a daily trip sheet for Plandome on which he wrote the time his shift began and ended, the identification number of the taxicab he drove, his daily passenger pick-ups and drop-offs, the times of the individual trips, and the amounts of the fares. The trip sheets were completed by Arena and submitted at the end of each shift.

Plandome asserts that it did not keep the daily trip sheets, but inputted into its computer the starting and ending times of each driver's shift, the total amount of the fares, and a computation of the driver's earnings.

Arena was paid in gross sums, and was issued a 1099 Form that Arena argues was issued to him after the Complaint in the instant action was filed. Arena asserts that other similarly situated drivers were issued W-2s by Defendants and were requested to sign New York State Department of Labor forms indicating that they were employees who earned the legally mandated wages.

According to Plaintiffs, Plandome charged a flat rate for fares which included sales tax. (Decl. of Joseph Arena, sworn to on Oct. 12, 2012 ("Arena Decl.") ¶ 21; Decl. of Ruben Fraiberg, sworn to on Oct. 12, 2012 ("Fraiberg Decl.") ¶ 22.) Further, Plaintiffs assert that Plandome had "house accounts" for frequent customers. (Arena Decl. ¶ 23.) While Defendants argue that Arena was paid based upon a pre-arranged formula consisting of one-half (50%) of the fares he collected minus a $6.00 dispatcher fee, $5.00 radio fee, and $3.00 dent fund fee, Arena argues that the drivers were also required to pay the taxes on the collected fares, as well as gasoline for the taxis. In addition, while Defendants state that Arena received his tips directly from his customers, Arena states that any tips charged on house accounts or credit cards went instead directly to Defendants. Both parties agree that Arena's remuneration did not change during the time he drove for Defendants.

## DISCUSSION

### I.  *Summary Judgment Standard*

Summary judgment pursuant to Rule 56 is appropriate only where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of

a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252) (internal quotation marks omitted), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th

Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination[s] of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

## II. WHETHER ARENA WAS AN EMPLOYEE OR INDEPENDENT CONTRACTOR

### A. FLSA Standard

As a threshold matter, in order for Arena's clams under the FLSA to survive dismissal, Arena must show that he was an employee of Plandome, rather than an independent contractor. *See Arena v. Delux Transp. Servs., Inc.*, 2014 WL 794300, at *7 (E.D.N.Y. Feb. 25, 2014). The FLSA defines an "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and to "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g). "Under the FLSA, the question of whether an employee-employer relationship exists is one of 'economic reality.' " *Velu v. Velocity Express, Inc.*, 666 F. Supp. 2d 300, 305 (E.D.N.Y. 2009) (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)).

There is no "rigid rule" for determining whether an employer-employee relationship exists; indeed, "[t]he Second Circuit has applied slightly different factors in different types of cases." *Arena*, 2014 WL 794300, at *7-8. For example, in a case evaluating whether a prisoner

who tutored in a community college's class program at prison was an employee covered by the minimum wage requirements of the Fair Labor Standards Act, the Second Circuit considered "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984) (citation and internal quotation marks omitted).

In another case, *Zheng v. Liberty Apparel Co.*, 355 F.3d 61 (2d Cir. 2003), which evaluated whether a garment manufacturer was a joint employer of garment workers hired as subcontractors, the Second Circuit applied factors which "indicate that an entity has functional control over workers even in the absence of . . . formal control." *Id.* at 72. Those factors include:

> (1) [W]hether [the defendant's] premises and equipment were used for the plaintiffs' work; (2) whether the [direct employer] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the defendant's] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [defendant] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the [defendant].

*Id.*; *see also Arena*, 2014 WL 794300, at *8.

Furthermore, in the case *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058-59 (2d Cir. 1988), in which the Second Circuit analyzed whether a nurse was an employee or independent contractor of a health care agency, the Court applied several factors identified in *United States v. Silk*, 331 U.S. 704, 716 (1947) to determine the employment relationship, including: "(1) the

degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business."

While the Court is guided by the above-mentioned factors, the Court may "consider any other factors it deems relevant to its assessment of the 'economic realities,' " *Zheng*, 355 F.3d at 72, and the determination of the employment relationship is ultimately based upon the totality of the circumstances. *See Barfield v. N.Y.C. Health and Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) ("[T]he determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in economic reality rather than technical concepts, determined by reference not to isolated factors, but rather upon the circumstances of the whole activity." (citations and internal quotation marks omitted)). The essential inquiry is "whether, as a matter of economic reality, the worker[ ] depend[s] upon someone else's business for the opportunity to render service or [is] in business for [himself]." *Brock*, 840 F.2d at 1059.

Based upon the foregoing, the Court will analyze the germane factors to assess the economic reality in this case. Notably, since many of the above-identified factors overlap with each other, the analysis of some factors will necessarily involve the analysis of other analogous factors.

### 1. *The Degree of Control Exercised by Defendants*

In support of their position that Arena was an independent contractor, Defendants produce undisputed evidence that Arena worked for Defendants only from August 9, 2011 to November 10, 2011, and only for 55 days during that period. (Defs.'s R. 56.1 Stmt. ¶¶ 21, 22.)

There were no ramifications if Arena chose not to work on any given day.  (*Id.* ¶ 27.)  Further, Arena was paid in a gross sum, and was issued a 1099 Form.  (*Id.* ¶¶ 29, 30.)  These facts provide some support for a finding that Arena was an independent contractor.  *See Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 600 (E.D.N.Y.  2012) ("The ability to reject assignments without penalty can support a finding of independent contractor status."); *Velu*, 666 F. Supp. 2d at 307 (finding plaintiff's "control over his own . . . work schedule" a relevant factor in the determination that plaintiff was an independent contractor); *cf. Hart v. Rick's Cabaret Int'l., Inc.*, 2013 WL 4822199, at *18 (S.D.N.Y. Sept. 10, 2013) (finding the fact that the plaintiff "dancers were required to perform a minimum number of days per week," and "were required to get permission for not appearing as required or scheduled" indicated an employer/employee relationship under the Labor Law).

Nonetheless, Arena points to several facts which indicate that he was an employee of Plandome rather than in independent contractor.  For instance, Plandome dictated the hours the drivers worked, and required the drivers to work on holidays.  (Arena Decl. ¶¶ 18, 19; Fraiberg Decl. ¶¶ 19, 20).  The drivers were not permitted to choose their own passengers or to drive to destinations without Plandome's prior approval.  (Arena Decl. ¶¶ 10, 11, 15, 16; Fraiberg Decl. ¶¶ 11, 12, 16, 17.)  The drivers were asked not to drive if they refused to drive the passengers who had made arrangements with Plandome.  (Arena Decl. ¶ 9; Fraiberg Decl. ¶ 10.)  The drivers were not permitted to take unauthorized breaks or go home without Plandome's permission, and upon being given permission to leave, the drivers were required to refuel the company vehicles and perform thorough maintenance and cleanliness inspections of the vehicles. (Arena Decl. ¶ 20; Fraiberg Decl. ¶ 21.)  The drivers were required to maintain and submit daily

trip sheets which recorded the times the drivers arrived at and left the base station, the identification number of the vehicles driven, lists of all trips made, and the fares charged. (Arena Decl. ¶ 34; Fraiberg Decl. ¶ 35.) Finally, Arena argues that although he was issued a 1099 Form, the 1099 Form was issued after the Complaint was filed, and evidence shows that other drivers were also issued W-2s which indicated that they were wage-earning employees. (Arena Decl. ¶ 35; Fraiberg Decl. ¶¶ 36-37.)

### 2. *The Opportunity for Profit or Loss*

As to this factor, Defendants argue that "[Arena] dictated his own schedule," and had the opportunity to drive taxicabs for other companies, including Plandome's competitors. (Aff. of Robert Marmo, sworn to on Aug. 29, 2012 ("Marmo Aff.") ¶¶ 22, 23.) Plaintiffs, on the other hand, dispute that the drivers were permitted to drive for Plandome's competitors. (Arena Decl. ¶ 10; Fraiberg Decl. ¶ 11.) Plaintiffs assert that the drivers were not permitted to share their personal phone numbers with passengers so as to permit the passengers to call them directly, nor were they permitted to determine the amounts of fares to charge the customers. (Arena Decl. ¶¶ 14, 21, 22; Fraiberg Decl. ¶¶ 15, 22, 23.) Plaintiffs additionally argue that any tips that were charged on passengers' credit cards or house accounts went to Plandome rather than to the drivers. (Arena Decl. ¶ 33; Fraiberg Decl. ¶ 34.)

### 3. *The Degree of Skill and Independent Initiative Required to Perform the Work*

While the parties agree that Arena was required to maintain a special license, i.e., a New York State Class E driver's license, (Defs.'s R. 56.1 Stmt. ¶ 24), Arena argues that other than the special driver's license, "there [we]re barely any additional skills required to" drive for Plandome as the drivers were "required to simply drive passengers . . . to pre-authorized

locations, and to adhere to company policies." (Pls.' Mem. in Opp'n. at 21-22.)

Although Arena was required to have a special license and the ability to navigate his passengers safely between locations, both characteristic of an independent contractor, *Arena,* 2014 WL 794300, at *10; *Leach v. Kaykov*, 2011 WL 1240022, *19 (E.D.N.Y. March 30, 2011), Arena did not need to exercise independent initiative with respect to obtaining passengers because all trip arrangements were made by Plandome, and the drivers were not permitted to independently cruise the neighborhoods to find passengers. Thus, this factor does not provide a significant indication of the type of working arrangement that existed between the parties.

### 4. *The Permanence or Duration of the Working Relationship*

Defendants assert, and Arena does not dispute, that Arena worked for only 55 days during the time period he was associated with Defendants, i.e., from August 9, 2011 to November 10, 2011. (Defs.'s R. 56.1 Stmt. ¶¶ 21, 22.) Although Arena has presented evidence which suggests that Plandome was his employer, i.e., that "Plandome ha[d] the power to hire and fire employees, supervise[] and control[] employee work schedules and conditions of employment, . . . [and] deny Plaintiffs the right to drive . . . [at] any time," (Pls.' Mem. in Opp'n. at 22), the fact that Arena was permitted to work on the days of his choosing creates an inference of his independence. *See Arena*, 2014 WL 794300, at *11 (finding evidence "that [the] Plaintiff had the discretion to set his own schedule and abide by it in his discretion without consequence [was] indicative of a temporary working relationship").

### 5. *The Extent to Which the Work is an Integral Part of the Employer's Business*

This factor provides little assistance in determining the employment relationship. While Arena argues that because Plandome was a transportation business, the operation of taxicabs was

"the most integral part of Defendants' business," (Pls.' Mem. in Opp'n. at 22), it is equally important that Arena was not an indispensable driver, since he was replaced by other drivers in his absence. *See Browning*, 885 F. Supp. 2d at 610 (observing that although drivers played an integral part in defendants' business, they were easily replaceable, and therefore "this factor only weigh[ed] slightly in favor of finding that the" drivers were employees under the FLSA). Thus, this factor does not compel or dispel a finding of an employer/employee relationship.

### 6. The Employer's Maintenance of Employment Records

The parties agree that Arena was required to maintain a daily trip sheet for Plandome, on which he recorded the time his shift began and ended, the identification number of the taxicab he drove, his daily passenger pick-ups and drop-offs, the times of the individual trips, and the amounts of the fares he collected. The trip sheets were completed by Arena and submitted at the end of each shift. (Defs.' R. 56.1 Stmt. ¶¶ 31, 32, 33.) However, Defendants assert that Plandome did not keep the daily trip sheets, but rather inputted into its computer the starting and ending time of each driver's shift, the total amount of the fares, and a computation of the driver's earnings. (*Id.* ¶¶ 34, 35.) Although Defendants produce evidence of a computer print-out demonstrating the information they claim Plandome inputted into its computers, (Exh. I to Affidavit of David S. Feather, dated August 30, 2012 ("Feather Aff.")), Plaintiffs challenge the admissibility of Defendants' evidence and assert that "a cursory examination of the documents strongly suggests [they were] created solely for the purposes of this litigation." (Pl.'s R. 56.1 Counterstmt. ¶ 36.) Defendants have not responded to Plaintiffs' challenge to the admissibility of Defendants' evidence. Therefore, since the admissibility of Defendants' evidence is unresolved for purposes of this motion, this factor does not assist the Court in its analysis of the

economic reality.

### 7. *Use of Employer's Equipment for Work*

Although Arena drove a company assigned vehicle, (Arena Decl. ¶ 26), the evidence does not indicate that Arena utilized any other equipment owned by Plandome. In fact, Arena was required to provide the fuel for the vehicle he used. (*Id.* ¶ 20.) Nevertheless, the taxicab was a critical piece of equipment for Arena, as a taxicab driver.

### 8. *Whether Arena Worked Exclusively for Defendant*

Here, too, the parties dispute whether Arena worked exclusively for Defendant. On the one hand, Defendants argue that Arena had the ability to drive for other taxicab companies, including Plandome's competitors. However, Arena argues that he was not permitted to simultaneously work for Plandome and its competitors. (Marmo Aff. ¶ 23; Arena Decl. ¶ 10; Fraiberg Decl. ¶ 11.)

In sum, while some factors indicate that Arena was Plandome's employee, *e.g.*, the degree of control exercised by Plandome, and the opportunity for profit or loss, other factors suggest that Arena was an independent contractor, *e.g.*, the lack of permanence of the relationship, and the fact that Arena's responsibilities could be passed to other employees. Accordingly, an evaluation of the factors, as well as the totality of the circumstances, demonstrate that a triable issue of fact exists as to whether Arena was Plandome's employee for purposes of the FLSA.

### B. *New York Standard*

Under New York law, "[t]he 'critical inquiry in determining whether an employment relationship exist[ed] pertains to the degree of control exercised by the purported employer over

the results produced or the means used to achieve the results.' " *Arena*, 2014 WL 794300, at *11 (quoting *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (2003)). Factors the Court may consider include: "whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." *Bynog*, 1 N.Y.3d at 198.

As discussed above, although Arena worked at his own convenience, when he did work, his schedule for transporting passengers was dictated by Plandome. In addition, the parties have presented competing evidence as to whether Arena was free to engage in other employment. As to the third factor, neither party has presented arguments and evidence as to whether Arena received fringe benefits. Finally, while Defendants argue that Arena was paid in gross sums and issued a Form 1099, Arena argues that he was issued the Form 1099 after the Complaint was filed, and, further, that other similarly situated employees were provided W-2s indicating that they were wage-earning employees. Therefore, these factors would similarly demonstrate a triable issue of fact as to whether Arena was an employee under New York law. However, as discussed fully, *infra*, the Labor Law and NYCRR exclude taxicab drivers, such as Arena, from the term "Employee," and, therefore, Arena was not an employee for purposes of the Labor Law or NYCRR.

### III. FLSA OVERTIME CLAIM

The FLSA's maximum hours rule requires employers to compensate their employees for workweeks longer than forty hours at a rate of one and one-half times the employees' regular wages. *See* 29 U.S.C. § 207. However, the FLSA contains an exemption to the maximum hours rule for "any driver employed by an employer engaged in the business of operating taxicabs." 29

U.S.C. § 213(b)(17).

In this case, the parties dispute whether Plaintiffs are exempt from the overtime provisions of the FLSA. Defendants argue that "Plaintiff[s] [are] exempt from the overtime provisions of the FLSA" because "Plaintiff[s] performed services as . . . taxicab driver[s] for the Defendant[s], and . . . the Defendant[s] [are] engaged in the business of operating taxicabs." (Defs.' Mem. in Support at 7.) Plaintiffs, on the other hand, argue that since Plandome's vehicles did not "constitute 'taxicabs' as meant by the FLSA taxicab exemption," the exemption does not apply. (Pls.' Mem. in Opp'n. at 6.)

As an initial matter, the Court notes that the parties' arguments address a relatively novel legal issue, and, as such, there is a dearth of case law to assist the Court in its determination. Nonetheless, as discussed fully below, the Court finds that Defendants' vehicles constitute taxicabs for purposes of the FLSA's taxicab exemption, and, therefore, Plaintiffs fall within the scope of the FLSA exemption.[2]

### A. Defendants' Arguments

Defendants assert that although the FLSA does not specifically define the terms "taxicab" and "taxicab driver," Chapter 24h of the United States Department of Labor Field Operations Handbook (1999 ed.) provides a definition of the term "business of operating taxicabs" which is instructive. (Defs.' Mem. in Support at 7.) "Business of operating taxicabs" is defined as

---

[2] The determination of whether Plaintiffs are exempt from the FLSA's overtime provisions, although "based on the underlying facts, is ultimately a legal question." *Rossi v. Associated Limousine Servs., Inc.*, 438 F. Supp. 2d 1354, 1359 (S.D. Fla. 2006); *Harper v. Gov't Emps. Ins. Co.*, 754 F. Supp. 2d 461, 463 (E.D.N.Y. 2010) ("The question of how an employee spends his time is factual, while the issue of whether such activities render the employee exempt from the FLSA's overtime provision is a question of law.").

follows:

> The taxicab business consists normally of common carrier transportation in small motor vehicles of persons and such property as they may carry with them to any requested destination in the community. The business operates without fixed routes or contracts for recurrent transportation. It serves the miscellaneous and predominantly local transportation need of the community. It may include such occasional and unscheduled trips to or from transportation terminals as the individual passengers may request, and may include stands at the transportation terminals as well as at other places where numerous demands for taxicab transportation may be expected.

DOL Field Operations Handbook 24h01. Defendants further argue that the United States Secretary of Transportation defines "local transportation" as "involv[ing] trips of no more than seventy (70) miles." (Defs.' Mem. in Support at 7.)

In support of their position, Defendants cite the cases *Cariani v. D.L.C. Limousine Serv., Inc.*, 363 F. Supp. 2d 637 (S.D.N.Y. 2005) and *Mitchell v. Yellow Cab Co.*, 36 Lab. Cas. (CCH) 65220 (1959). In *Cariani*, the court held that the defendant, which maintained a fleet of primarily five passenger vehicles used to provide pre-arranged or airport transportation services, was entitled to the FLSA's taxicab exemption. 363 F. Supp. 2d at 639, 645. The court observed that certain factors "suggest[ed] that [the] defendant should fit within the taxicab exemption," such as: the lack of fixed routes or schedules; the door-to-door service provided; the customer's determination of the time and destination of the trip; the lack of a contract with any airline or other company; and fares equivalent to those charged by other taxi companies, but less than those charged by limousine services. *Id.* at 644. The court also observed that factors weighed against a finding that the taxicab exemption should apply, namely that: the defendant was not regulated as a taxi company by the local Taxi and Limousine Commission, but instead as a "for

hire" vehicle; the defendant did not advertise as a taxi company; the fares were predetermined instead of metered; usually more than one passenger was transported at a time; and the drivers did not control their own time or cruise for passengers. *Id.* Since the factors did not conclusively determine the issue, the Court based its decision upon the Department of Labor's definition of "business of operating taxicabs," finding that the defendant was entitled to the exemption because the defendant's business fell within the agency's definition. *Id.* at 645.

Notably, the court in *Cariani* determined that because the Department of Labor is "the federal agency responsible for administering the F.L.S.A.," its definition is "entitled to considerable deference," and, therefore, the local Taxi and Limousine Commission's designation of the defendant's company as a " 'for hire car' operator," rather than a taxi company, had to "give way" to the Department of Labor's definition. *Id.* at 644-45. The *Cariani* court observed that "[a] uniform definition of the term 'business of operating taxicabs' devised by the Department of Labor better serves the purposes of a federal labor law than does application of a variety of local definitions, which are practically guaranteed to lead to different results in different parts of the country." *Id.* at 645.

The court in *Mitchell* similarly found that the taxicab exemption applied where:

> (1) the company ha[d] no agreement with any airline for the transportation of any of its passengers or crews, (2) the method and manner of the company's operations [we]re not in any manner controlled by any airline, (3) no fixed routes ha[d] been designated and the drivers [we]re privileged to deliver their passengers to any point in the city or surrounding areas, (4) the passengers themselves arrange[d] and pa[id] for their transportation by taxicab, (5) the company ha[d] no monopoly on taxicab service to or from the airport, (6) the services furnished by unmetered taxicabs d[id] not substantially differ from those furnished by metered taxicabs and ha[d] standard rates for transportation

to and from many points in the area, and (7) the company operate[d] the metered and the unmetered taxicabs as an integrated operation, without segregation of services pertaining to transportation to and from the airport, and assign[ed] the drivers interchangeably to either type of vehicle.

*Mitchell*, 36 Lab. Cas. (CCH) 65220.

Defendants urge the Court to reach a similar result in this case because Plandome's drivers transported individuals and their property from one location to another, primarily within the Town of North Hempstead, and Plandome maintained a taxi stand at the Manhasset railroad station in addition to arranging services for individuals who called its main dispatch. In addition, Defendants argue that Plandome did not have fixed routes or contracts for recurring transportation, it required its drivers to have New York State Class E licenses, and it charged fares based upon geographical zones. (Defs.' Mem. in Support at 9.) Based upon these facts, Defendants assert that Plandome's business falls within the definition of "business of operating taxicabs," and the exemption should apply.

### B. Plaintiffs' Arguments

Since the FLSA exemption does not specifically define "business of operating taxicabs," Plaintiffs argue that a two-step statutory interpretation analysis should be performed to determine the statute's meaning of "taxicabs." (Pls.' Mem. in Opp'n. at 6-7.) According to Plaintiffs, the Court should apply the analysis identified in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984), which requires the Court to first determine if Congress has spoken on the issue, and, if not, the Court should defer to an agency's reasonable interpretation of the statute. (*See* Pls.' Mem. in Opp'n. at 7.)

Plaintiffs argue that Congress's intent can be ascertained by the plain, unambiguous

meaning of "taxicab," which, according to standard dictionary definitions, "is a taxi with a taximeter."  (*Id.* at 8.)  Plaintiffs further assert that the purpose of the FLSA taxicab exemption, as well as the exemption's relationship to other federal statutes indicate Congress's intent.  (*Id.* at 9.)

Specifically, Plaintiffs argue that because Congress enacted the FLSA wage and hour requirements to ensure adequate compensation for workers, "[f]or-hire vehicle drivers, who usually work 12-hour shifts and [whose] compensation is largely controlled by the customer calls that are directed to them by the dispatch service, are the workers the FLSA was designed to protect."  (Pls.' Mem. in Opp'n. at 9-10.)  According to Plaintiffs, for-hire drivers, such as Plaintiffs, do not "have control over their ability to earn compensation" as do taxicab drivers because for-hire drivers cannot pick up street hails.  (*Id.* at 10.)  Moreover, Plaintiffs argue that the "reasons for exempting employees from overtime[,] such as" that the employees do not work standard hours, or their work cannot "be easily spread to other workers after 40 hours in a week," do not apply to for-hire drivers who do not have the same autonomy and discretion as taxicab drivers.  (*Id.* at 10-11.)

Plaintiffs assert that courts must narrowly construe the FLSA exemptions, and because "Congress did not include for-hire vehicles in the taxicab exemption, courts cannot read them into the statutory language."  (*Id.* at 12.)  Plaintiffs point to a "taxicab service" exemption found in the Motor Carrier Act ("MCA"), which excludes from its coverage "taxicabs, or other motor vehicles performing a bona fide taxicab service, having a capacity of not more than six passengers and not operated on a regular route or between fixed terminals."  *See Buck v. People of State of Cal.*, 343 U.S. 99, 101 (1952) (quoting 49 Stat. 545).  It is Plaintiffs' contention that

because the MCA's exemption recognizes that "other motor vehicles" besides taxicabs may perform taxicab services, "there is a broader category of 'taxicab service' " which encompasses both taxicabs and for-hire vehicles. (Pls.' Mem. in Opp'n. at 13.) Thus, Plaintiffs conclude that because the MCA's exemption was in existence at the time the FLSA was enacted, by only exempting drivers of "taxicabs" from FLSA coverage, Congress intended to exempt only drivers of traditional taxicabs with taximeters. (*Id.*)

Moreover, Plaintiffs assert that even if the Court defers to the Department of Labor's agency interpretation of the term "taxicab," "the Department of Labor has adopted the ordinary meaning of the term 'taxicab.' " (Pls.' Mem. in Opp'n. at 14-16.) According to Plaintiffs, the Department of Labor Field Handbook does not define "taxicab," but rather "defines a 'taxicab business' which includes those 'other motor vehicles' that provide 'taxicab service.' " (*Id.* at 15.) Thus, it is Plaintiffs' position that because the FLSA's exemption pertains to "taxicabs," not "taxicab service" or "taxicab business," the Field Handbook's definition is "unhelpful and unpersuasive." (*Id.*)

Plaintiffs also cite to a Department of Labor 1998 Opinion Letter, which provides:

> The ordinary meaning of [taxicab] contemplates vehicles that are offered for hire to the general public on city streets. While it is not necessary that all the transportation be provided to persons who "flag down" the vehicles, that is an important aspect of the common meaning of "taxicab" which your client's vehicles do not possess.

1998 WL 852774 (DOL WAGE-HOUR). Plaintiffs argue that this definition confirms that "the ordinary meaning [of taxicab] includes the ability to street hail" and the calculation of spontaneous and unplanned ride fares through the use of a taximeter. (Pls.' Mem. in Opp'n. at

16.)

Plaintiffs argue that case law supports their position. Plaintiffs cite *Rossi v. Associated Limousine Servs.*, 438 F. Supp. 2d 1354 (S.D. Fla. 2006), and *Powell v. Carey Int'l, Inc.*, 490 F. Supp. 2d 1202 (S.D. Fla. 2006), in which both courts similarly held that the defendant limousine companies did not fall within the taxicab exemption because they advertised themselves as limousine companies, did not have their drivers cruise for passengers, and they charged flat or hourly fares rather than metered rates. *See Rossi*, 438 F. Supp. 2d at 1363; *Powell*, 490 F. Supp. 2d at 1213. The court in *Powell* additionally noted that the defendant limousine company had contracts for recurrent transportation and utilized large vehicles unlike traditional taxicabs. *Powell*, 490 F. Supp. 2d at 1213.

Plaintiffs also cite *Herman v. Brewah Cab, Inc.*, 992 F. Supp. 1054 (E.D. Wis. 1998), in which the court held that "[t]he nature of the defendants' business, the working conditions of the drivers and the licensing scheme under which the defendants operate[d] all weigh[ed] against a finding that the defendants' business [was] that of a taxicab company under § 213(b)(17)." *Id.* at 1060. The court in *Herman* reasoned that the exemption did not apply because (1) the drivers were required to adhere to prearranged schedules, (2) the drivers were permitted to drive only passengers who had made prior arrangements for services, (3) more than one passenger was usually transported at a time, (4) the vehicles were unmetered, without vacancy signs, and were not advertised as taxicabs, (5) the defendants were involved in various subsidy programs, (6) the drivers were not permitted to receive tips, and (7) the defendants' vehicles were not licensed as a taxicabs, but instead as "handicapped elderly vehicles." *Id.* at 1059-60. Based upon these cases, Plaintiffs argue that "Plandome's for-hire vehicles, which are unable to pick up street hails and

are not operated by taximeters, do not qualify for the FLSA taxicab exemption." (Pls.' Mem. in Opp'n. at 17.)

Finally, Plaintiffs argue that even if Plandome's vehicles constitute "taxicabs" as defined by the Town of North Hempstead, the Town's local law does not control because Congress did not intend the term "taxicab" to depend upon definitions found in local laws. Plaintiffs contend that "any designation [of Plandome's vehicles] as . . . taxicab[s] by the Town of North Hempstead also conflicts with the fact that the NCTLC [regulates and provides licenses for only] for-hire vehicles." (*Id.* at 17-18.)

### C. Analysis

"Statutory analysis begins with the text and its plain meaning, if it has one." *Gottlieb v. Carnival Corp.*, 436 F.3d 335, 337 (2d Cir. 2006). "[I]f an attempt to discern the plain meaning fails because the statute is ambiguous," *Green v. City of New York*, 465 F.3d 65, 78 (2d Cir. 2006), "we resort to the canons of statutory construction to help resolve the ambiguity." *Gottlieb*, 436 F.3d at 337. When the plain meaning of the statute cannot be ascertained, and the canons of construction do not resolve the ambiguity, the court must turn to the statute's legislative history. *Green*, 465 F.3d at 78; *Gottlieb*, 436 F.3d at 338. "Finally, if the canons of statutory interpretation and resort to other interpretive aids (like legislative history) do not resolve the issue, [the court] will give deference to the view of the agency tasked with administering the statute . . . ." *Natural Res. Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 98 (2d Cir. 2001); *EPA v. Nat'l Crushed Stone Ass'n*, 449 U.S. 64, 83 (1980) ("It is by now . . . commonplace that 'when faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its

administration.' " (quoting *Udall v. Tallman*, 380 U.S. 1, 16 (1965))).

In this case, the plain meaning of the FLSA's statutory exemption for "any driver employed by an employer engaged in the business of operating taxicabs," and, in particular, what constitutes "the business of operating taxicabs," is elusive. Indeed, the few cases that address the taxicab exemption, and their contradictory interpretations of same, demonstrate that the taxicab exemption is not susceptible to a simple construction.

Despite Plaintiffs' argument that the Court should adopt a standard dictionary definition for the term "taxicab," the Court agrees with Defendants that the definitions cited by Plaintiffs, i.e., "a car licensed to transport passengers in return for payment of a fare, usually fitted with a taximeter," New Oxford Am. Dictionary 1739 (Oxford Univ. Press 2001), and "an automobile in which passengers are carried for a fare at a rate usually recorded by a taximeter," Webster's New World Dictionary, College Edition, 1494 (1957), indicate that, contrary to Plaintiffs' contention, not all taxicabs must have taximeters. (Defs.' Reply at 3.) Moreover, Defendants offer a different dictionary definition of "taxicab" that does not mention taximeters, but rather defines a "taxicab" as "an automobile that carries passengers for a fare usually determined by the distance traveled." Taxicab Definition, Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/taxicab (last visited April 3, 2014). Accordingly, these varying dictionary definitions provide little illumination as to the plain meaning of the statutory exemption.

Turning to the canons of statutory construction, the Court observes that the parties have not suggested any canons of construction to assist in determining the meaning of the taxicab exemption, nor has the Court discovered any useful canons upon its own research. Thus, the

Court will analyze the legislative history of the statutory exemption.

As noted by Plaintiffs, "Congress enacted the FLSA in 1938 to eliminate 'labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers,' " and "[i]n [furtherance of] that effort, the FLSA imposes numerous 'wage and hour' requirements." *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 104 (2d Cir. 2010) (quoting 29 U.S.C. § 202 (a)). However, there are exemptions to the wage and hour requirements. *See* 29 U.S.C. § 213. The "[e]xemptions . . . are to be narrowly construed, and the burden of proving that employees are exempt falls on the employer." *Cariani*, 363 F. Supp. 2d at 641.

The taxicab exemption states, in pertinent part, that "[t]he provisions of section 207 [entitled "Maximum hours"] . . . shall not apply with respect to . . . (17) any driver employed by an employer engaged in the business of operating taxicabs." 29 U.S.C. § 213(b). Initially, the Court notes that Plaintiffs have not cited to any legislative history which would indicate Congress's purpose in specifically exempting from the FLSA's overtime provisions those "drivers employed by an employer engaged in the business of operating taxicabs." Indeed, the Court performed its own research of the legislative history of the FLSA's minimum wage and maximum hour law and its exemptions, and was unable to find any explicit explanation for the taxicab exemption or, for that matter, any general explanation for the exemptions.

Despite the statute's apparent silence as to Congress's intent, the Eighth Circuit has proffered an explanation of the general rationales underlying all of the exemptions:

> The section of the Act granting exemptions deals with employment of a character or with employees of a class to which application of the provisions of

the Act for minimum wages and maximum hours is either impracticable or impossible, or with employees in occupations in which the conditions of labor are regulated by other statutes, or with employees the greater part of whose labor is in intrastate commerce.

*Helena Glendale Ferry Co. v. Walling*, 132 F.2d 616, 619 (8th Cir. 1942).

Here, the parties have not argued that the intrastate commerce rationale applies, or that taxicab drivers' labor conditions are regulated by other statutes. However, the Court notes that Congress may have intended drivers for taxicab businesses to be exempt from the FLSA provisions because taxicab businesses are usually regulated by local laws. *See Buck v. People of State of Cal.*, 343 U.S. 99, 102 (1952) ("The operation of taxicabs is a local business. For that reason, Congress[, when enacting the Motor Carrier Act of 1935,] left the field largely to the states."); *People v. Jabaar*, 163 Misc. 2d 1045, 1049 (Justice Ct. Nassau Co. 1994) ("Congress has explicitly exempted taxicabs from Federal regulation because taxicabs are local in nature."). If that is so, then it would seem that Plaintiffs would fall within the exemption too.

The third possible general rationale for the taxicab exemption, according to *Helena*, is that application of the overtime provisions to taxicab drivers is too difficult. However, this general rationale does not provide a basis for distinguishing between drivers of vehicles that are not operated by taximeter and are unable to pick up street hails, and drivers of vehicles that have taximeters and pick up street hails.

Arena argues that the exemption should not apply to him because he was a "for-hire" driver who worked 12-hour shifts, and whose compensation was ultimately dictated by the customers who called Plandome's dispatch to make arrangements. In essence, Arena seeks to distinguish his type of employment arrangement from that of a taxicab driver in that he worked

long shifts and was unable to control his ability to earn compensation because he was unable to cruise the streets to pick up passengers. However, the fact that Arena was told which passengers to drive does not explain why he should not be exempt from the overtime provisions whereas a driver who cruises for fares should be exempt. Perhaps it is Arena's suggestion that a taxicab driver, who is guaranteed the minimum wage under the FLSA, as is Arena, but is exempt from the FLSA's overtime provisions, is certain to collect fares during his overtime hours because of his autonomy, whereas Arena should be given overtime pay because he is not certain to earn sufficient fares during his overtime hours given his lack of autonomy. However, in order to make the kind of distinction between so-called "for-hire" drivers and taxicab drivers that Arena requests, the Court would be required to speculate as to Congress's intent in creating the taxicab exemption where its intent has not been made clear. This it cannot do.

Plaintiffs additionally argue that the "reasons for exempting employees from overtime[,] such as" that the employees perform work that is "difficult to standardize to any time frame," or their work cannot "be easily spread to other workers after 40 hours in a week," do not apply to for-hire drivers who do not have the same autonomy and discretion as taxicab drivers. (Pls.' Mem. in Opp'n. at 11.) However, these justifications for the overtime exemption cited by Plaintiffs from the case *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2173 (2012), pertain to the FLSA's overtime exemption for outside salesmen, not taxicab drivers. Moreover, Plaintiffs have not argued that the work of a driver of a metered taxicab cannot be spread to others, thereby justifying the overtime exemption for those drivers, while the work of alleged "for-hire" drivers, such as Plaintiffs, can be spread to others, therefore justifying overtime compensation for Plaintiffs. The failure to argue that the work of taxicab drivers cannot be

26

spread to others indicates that the inability to spread work was not a purpose underlying the taxicab exemption, contrary to Plaintiffs' contention. Similarly, Plaintiffs have not argued that their work hours differ from those of taxicab drivers, such that taxicab drivers should be exempt from overtime compensation while they should receive overtime compensation. Consequently, Plaintiffs have failed to explain why the Court should draw a line of demarcation between their type of employment and that of a driver of a metered taxicab for purposes of the taxicab exemption.

In sum, although it is clear that Congress intended to exclude "driver[s] employed by an employer engaged in the business of operating taxicabs" from the FLSA's overtime requirements, Congress's specific intent in providing for the exemption remains unclear. Consequently, the Court will defer to authoritative agency positions and interpretations.

As noted *supra*, the Department of Labor is the agency charged with administering the FLSA. The Court deems the Department of Labor's definition of the phrase "business of operating taxicabs" most helpful in determining whether Plaintiffs are "driver[s] employed by an employer engaged in the business of operating taxicabs." Namely, the Department of Labor specifically defines "Business of operating taxicabs" as:

> The taxicab business consists normally of common carrier transportation in small motor vehicles of persons and such property as they may carry with them to any requested destination in the community. The business operates without fixed routes or contracts for recurrent transportation. It serves the miscellaneous and predominantly local transportation needs of the community. It may include such occasional and unscheduled trips to or from transportation terminals as the individual passengers may request, and may include stands at the transportation terminals as well as at other places where numerous demands for taxicab transportation may be expected.

DOL Field Operations Handbook 24h01 (1999 ed.).

Here, the facts show that Plandome's drivers drove people and their property in small motor vehicles to destinations requested by the passengers. Plandome's business operated in the local Town of North Hempstead area, without fixed routes or contracts for recurrent transportation. In addition, Plandome had taxi stands at a local railroad station and on a local road. Therefore, Plandome's business fits squarely within the definition of "Business of operating taxicabs," as defined by the Department of Labor.

Although Plaintiffs argue that the Court should defer only to the interpretation of "taxicab" found in the Department of Labor's 1998 Opinion Letter, (Pls.' Mem. in Opp'n. at 16), the exemption at issue pertains to "drivers employed by an employer engaged in the business of operating taxicabs." Thus, the critical question is what "business of operating taxicabs" means, and the Department of Labor's definition of "business of operating taxicabs" is directly on point. Moreover, the Department of Labor's definition of "business of operating taxicabs" provided in the 1999 edition of the Labor Field Operations Handbook is more recent and expansive than the two sentence interpretation of "taxicab" found in the 1998 Opinion Letter.[3] Accordingly, the Court is persuaded by the Department of Labor's interpretation of the term "Business of operating taxicabs," and finds that Plaintiffs are exempt from the FLSA's overtime provisions as "driver[s] employed by an employer engaged in the business of operating taxicabs."[4]

---

[3] As previously noted, the Opinion Letter states that: "The ordinary meaning of [taxicabs] contemplates vehicles that are offered for hire to the general public on city streets. While it is not necessary that all the transportation be provided to persons who 'flag down' the vehicles, that is an important aspect of the common meaning of 'taxicab' which your client's vehicles do not possess." Opinion Letter Fair Labor Standards Act, 1998 WL 852774, at *1 (April 17, 1998).

[4] The Department of Labor's Field Operations Handbook and opinion letter are "entitled to deference only to the extent that [they] ha[ve] the 'power to persuade.' " *Ferrell v. ConocoPhillips Pipe Line Co.*, 2010 WL

## IV.    FLSA MINIMIMUM WAGE CLAIM

Defendants argue that Arena was always paid more than the minimum wage.  (Defs.' Mem. in Support at 12; Exh. I to Feather Aff.)  However, Arena disputes Defendants' contention, arguing that the compensation amounts reflected in Defendants' evidence are not accurate because they do not account for the fact that Arena was required to pay for gasoline and taxes.  (Pls.' Mem. in Opp'n. at 23; Arena Decl. ¶ 33; Fraiberg Decl. ¶ 34.)  Notably, Defendants do not provide any argument in response to Plaintiffs' opposition.  Accordingly, there is an issue of fact as to whether Plaintiffs were paid the minimum wage mandated by the FLSA which precludes summary judgment on this claim.

## V.    SPREAD OF HOURS AND NEW YORK STATE LABOR LAW CLAIMS

Plaintiffs' second cause of action alleges violations of the minimum wage and overtime provisions of New York Labor Law §§ 650 et. seq.  In addition, Plaintiffs' third cause of action alleges violations of 12 NYCRR § 142-2.4 of the Department of Labor's Minimum Wage Order for Miscellaneous Industries and Occupations, entitled, "Additional rate for split shift and spread of hours," which provides:

> An employee shall receive one hour's pay at the basic minimum hourly wage rate, in addition to the minimum wage required in [Part 142. Minimum Wage Order for Miscellaneous Industries and Occupations of the Department of Labor's Division of Labor Standards] for any day in which:
>
> the spread of hours exceeds 10 hours; or

---

1946896, at *7 (C.D.Cal. May 12, 2010); *see also Klinedinst v. Swift Invs., Inc.*, 260 F.3d 1251, 1255 (11th Cir. 2001) (observing that "[a]lthough the Field Operations Handbook is not entitled to *Chevron* deference, . . . it [is] persuasive") (footnote omitted); *but see Christensen v. Harris Cnty.*, 529 U.S. 576, 589 (2000) (Scalia, J., concurring in part and concurring in judgment) ("[W]e have accorded *Chevron* deference not only to agency regulations, but to authoritative agency positions set forth in a variety of other formats.").

there is a split shift; or

both situations occur.

12 NYCRR 142-2.4.

However, Defendants argue that Plaintiffs are exempt from the overtime and minimum wage provisions of the Labor Law because, "[u]nder New York State Labor Law § 651(5)(e), the definition of the term 'Employee' excludes any individual who is employed or permitted to work as a driver engaged in operating a taxicab." (Defs.' Mem. in Support at 10.) In addition, Defendants argue that Plaintiffs are exempt from the spread of hours requirements because "12 NYCRR § 142-2.14(c)(6) exempts taxicab drivers from the definition of employees who are subjected to the provisions of that regulation." (*Id.* at 14.) Thus, Defendants conclude that taxicab drivers, such as Plaintiffs, are exempt from the state's overtime, minimum wage and spread of hours laws.

While Plaintiffs argue that they were employees under the Labor Law, rather than independent contractors, (Pls.' Mem. in Opp'n. at 19-22), and that they did not receive the legally mandated minimum wage and overtime compensation, (*id.* at 23), Plaintiffs do not present any arguments in opposition to Defendants' contentions that they are exempt from the Labor Law's provisions and the spread of hours requirements. Indeed, Defendants observe that "Plaintiffs apparently do not contest the Defendants' assertion[s] that they are exempt from the overtime and minimum wage provisions of the New York State Labor Law, as well as from the 'spread-of-hours' provisions." (Defs.' Reply at 8.) Despite Plaintiffs' failure to oppose Defendants' assertions, the Court will analyze Defendants' entitlement to summary judgment on Plaintiffs' Labor Law and spread of hours claims.

Just as the FLSA's exemption does not define "business of operating taxicabs," the Labor Law's exemption does not define a "driver engaged in operating a taxicab." However, Defendants suggest that guidance is provided by 12 N.Y.C.R.R. § 142-2.14(c)(6), which defines the term "a driver engaged in operating a taxicab" as follows:

> The term **driver engaged in operating a taxicab** means an individual employed to drive an automobile equipped to carry no more than seven passengers, which is used in the business of carrying or transporting passengers for hire on a zone or meter fare basis, and the use of which is generally limited to a community's local transportation needs and which is not operated over fixed routes, or between fixed terminals, or under contract.

Further, Defendants argue "that is exactly what [Arena] did," i.e.:

> He only drove five (5) passenger vehicles, and transported individuals, and their property, from location "A" to location "B". The transportation was local, primarily within the Town of North Hempstead. Plandome Taxi maintains a taxi stand at the Manhasset train station, but also services individuals who call the main dispatch for a taxicab to transport them to and from other locations. Fares charged to customers by Plandome Taxi are based on geographical zones. Plandome Taxi's routes are not fixed, but rather are dictated by the customer. Finally, Plandome Taxi has no contracts for recurrent transportation.

(Defs.' Mem. in Support at 10.)

Once again, the Court ventures into uncharted territory as the question of whether Plaintiffs' type of employment constituted "operating a taxicab" under the Labor Law is apparently an issue of first impression. Neither party has presented any case law discussing 12 N.Y.C.R.R. § 142-2.14(c)(6) or the taxicab driver exemption under Labor Law § 651(5)(e), nor has the Court found any upon its own research. Nevertheless, based upon and in deference to the New York State Department of Labor's definition of "driver engaged in operating a taxicab," the Court finds that the exemption applies to Plaintiffs, and their Labor Law and spread of hours

claims must be dismissed. *See Barenboim v. Starbucks Corp.*, 21 N.Y.3d 460, 470 (2013) (stating that the Department of Labor's interpretation of the Labor Law is "entitled to deference") (citations and quotation marks omitted). As fully discussed by Defendants, Plaintiffs' employment activities fell squarely within the Department of Labor's definition of "operating a taxicab." Accordingly, since Labor Law § 651(5)(e) exempts individuals employed as "driver[s] engaged in operating a taxicab" and 12 NYCRR 142-2.14 exempts "driver[s] engaged in operating a taxicab," Plaintiffs are exempt from the Labor Law's provisions, as well as the NYCRR's spread of hours requirements, and summary judgment in favor of Defendants is appropriate on Plaintiffs' Labor Law and spread of hours claims.[5]

## VI.    PLAINTIFFS' CONVERSION CLAIM

Plaintiffs' fifth cause of action sounds in conversion. According to Plaintiffs, "Defendants wrongfully deducted monies from wages earned [by Arena] and all other non-managerial employees of Defendants for car insurance premiums even though no such insurance payments were actually paid[, and this] constitute[s] fraud and conversion." (Compl. ¶ 71.) In addition, Plaintiffs allege that "Defendants' intentional deduction from [Arena's] paycheck for amounts to pay withheld taxes together with Defendants' subsequent failure to pay such taxes constitutes fraud and conversion." (*Id.* ¶ 72.)

The parties discuss the conversion claim in conjunction with the wrongful deduction

---

[5] Although Defendants state that Plaintiffs' overtime, minimum wage and spread of hours claims require dismissal because Plaintiffs did not constitute employees for purposes of the Labor Law's minimum wage and overtime provisions and the NYCRR's spread of hours requirements, the Court notes that Plaintiffs' wrongful deduction claim under Labor Law § 193 must also be dismissed for the same reason, i.e., that Plaintiffs did not constitute employees under the Labor Law. *See* N.Y. Lab. Law § 193(1) ("No employer shall make any deduction from the wages of an *employee* . . . .") (emphasis added).

claim, focusing primarily on the alleged wrongful deduction pursuant to Labor Law § 192 rather than the conversion claim. Since the Court has determined that Plaintiffs' wrongful deduction claim under the Labor Law must be dismissed, the Court will consider the parties' arguments as they pertain to Plaintiffs' conversion claim.

Defendants argue that Plaintiffs' conversion claim must be dismissed because:

> [Arena] was paid based on a simple mathematical equation. That equation was one-half of the day's fares, minus a $5.00 "radio" fee, a $6.00 "dispatcher" fee, and $3.00 to the company's "dent" fund. In this way, [Arena's] earnings fluctuated, and were akin to a commission structure. The payment of the above-referenced fees were not deducted after the [Arena's] earnings were determined, but rather, were part of the computation of those earnings.

(Defs.' Mem. in Support at 16.)

Plaintiffs argue in response that "Defendants wrongfully deducted monies from wages by making the drivers pay for gas, fees to use the dispatcher, fees for the dent fund, and requir[ed] them to split fares with Plandome," and that "Plaintiffs never authorized these payments." (Pls.' Mem. in Opp'n. at 23, 24.)

"A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49-50 (2006) (citing *State of New York v. Seventh Regiment Fund, Inc.*, 98 N.Y.2d 249 (2002)). "Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Id.* at 50 (internal citations omitted).

Although Defendants have presented evidence that "[Arena] was paid based on a pre-

arranged, agreed-upon formula. . . [of] one-half (50%) of all of the fares that he collected, minus a $5.00 'radio' fee, a $6.00 'dispatcher' fee, and a $3.00 'dent' fund fee" (Marmo Aff. at 5), Defendants have not presented evidence that [Arena] authorized the deduction of "car insurance premiums" or "taxes" from his wages. Indeed, neither party addresses Plaintiffs' claim that Defendants' wrongfully withheld monies "to pay withheld taxes." Further, while it is possible that the alleged car insurance premiums deducted from Arena's wages were actually those amounts Defendants have described as the "dent fund fee[s]," Defendants have not clarified that issue for the Court. Accordingly, there are issues of fact as to whether Defendants converted Plaintiffs' monies by deducting monies from their wages for car insurance premiums and taxes without permission or authority to do so.

## CONCLUSION

For the reasons stated above, summary judgment is granted to Defendants on Plaintiffs' FLSA overtime claim, Labor Law claims, and spread of hours claim, and denied to Defendants on Plaintiffs' conversion claim and FLSA minimum wage claim.

**SO ORDERED.**

Dated: Central Islip, New York
     April 14, 2014

                                /s/
                            Denis R. Hurley
                            United States Senior District Judge